1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3  DWIGHT MALLOY,                    )  Case No. 2:22-cv-00286-ART-VCF
                                     )
4             Plaintiff,             )  Las Vegas, Nevada
                                     )  Thursday, March 2, 2023
5        v.                          )  11:03 A.M. - 12:24 P.M.
                                     )  Courtroom 6C
6  AMAZON.COM SERVICES, LLC,         )  MOTION HEARING
                                     )
7             Defendant.             )  *C E R T I F I E D   C O P Y*
   _____)

8

9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS

11            THE HONORABLE ANNE R. TRAUM
               UNITED STATES DISTRICT COURT JUDGE

12

13

   APPEARANCES:  (See next page.)

14

15  REPORTED BY:  PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                  United States District Court
16                333 South Las Vegas Boulevard
                  Las Vegas, Nevada  89101

17

18

19

20

21

22

23

24  Proceedings reported by machine shorthand.
    Transcript produced by computer-aided transcription.

25

 1   **APPEARANCES:**

 2

 3   For Plaintiff Dwight Malloy:

 4          **DON J. FOTY, ESQ.**
            *HODGES & FOTY LLP*
 5          Two Greenway Plaza
            Suite 250
 6          Houston, TX 77046
            (713) 523-0001
 7          E-mail: whogg@gftrialfirm.com

 8

 9   For Defendant Amazon.com Services, LLC:

10          **MONTGOMERY Y. PAEK, ESQ.**
            *LITTLER MENDELSON*
11          3960 Howard Hughes Parkway
            Suite 300
12          Las Vegas NV 89169
            (702) 862-8800
13          E-mail: mpaek@littler.com

14

15

16

17

18

19

20

21

22

23

24

25

1      LAS VEGAS, NEVADA; THURSDAY, MARCH 2, 2023; 11:03 A.M.

2                          --o0o--

3                  P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  This is the date and time

5   set for oral arguments regarding defendant's motion to dismiss in

6   Case No. 2:22-cv-00286-ART-VCF, Dwight Malloy vs. Amazon.com

7   Services, LLC.

8          Counsel, please state your appearances for the

9   record.

10         **MR. FOTY:**  Good morning, Your Honor.  Don Foty on

11  behalf of the plaintiffs.

12         **THE COURT:**  Good morning.

13         **MR. PAEK:**  Good morning, Your Honor.  Montgomery Paek

14  of Littler Mendelson on behalf of defendant.

15         **THE COURT:**  Good morning.  So, Mr. Paek, this is your

16  motion.

17         Would you like -- so I was thinking we'll just have

18  argument.  I have some questions.  And I'll let you start and

19  then have the final word.  But I was -- you know, see how long

20  you take, but maybe 20 minutes a side, or so.  See how it goes.

21  Okay.  Thank you.

22         **MR. PAEK:**  Thank you, Your Honor.

23         Your Honor, the motion before the Court has several

24  alternative arguments, as the Court is aware from the briefing.

25  But the most straightforward test with the clearest guidepost for

 1    the Court is the Portal-to-Portal Act analysis.

 2              To look at that analysis, we must first clear up some

 3    mischaracterized framework in the briefing.  The question is not

 4    whether Nevada has adopted the Portal-to-Portal Act separately

 5    from the FLSA and its developed -- developed body of case law.

 6    That has never been the test set out by the Nevada Supreme Court.

 7              Instead, the Nevada Supreme Court has held that it

 8    shall follow federal minimum wage and overtime law because

 9    Nevada's minimum wage and overtime law are modelled after the

10    FLSA.  And that includes, by necessity, amendments and related

11    case law, unless the Nevada statutes in question, quote, signals

12    any attempt -- intent to deviate from federal law.  And that's

13    the holding in Terry vs. Sapphire.

14              **THE COURT:**  But isn't the statute -- I'm thinking of,

15    particularly, 608.016.

16              Isn't the text of that statute a reflection of the

17    legislature's intent that every hour worked gets paid?

18              **MR. PAEK:**  So the 608.016 gets a little bit

19    more -- it does talk about each hour worked, but that language

20    can't be looked at in a vacuum.  And that gets into the

21    legislature's intent of passing that language as to trial and

22    breaking periods.

23              There is some additional language in 608.016 that was

24    amended later where 608.016 added --

25              **THE COURT:**  Ask you briefly about the -- the language

1    on trial periods and break periods, isn't the sum of that

2    language just that work gets paid?

3            **MR. PAEK:**  No.  That's -- that's -- it's not that

4    clearcut, Your Honor.  It's -- it's different than the way it's

5    been characterized because really what it's talking about is

6    periods of work.  And it's not necessarily conflicting with the

7    definition of work in the FLSA.

8            And that's the issue is that Terry vs. Sapphire,

9    Nevada Supreme Court said the language can actually be different.

10   It can be different, but the test is whether or not it's, quote,

11   conflicting or, quote/unquote, materially different.  And that

12   distinction is important because plaintiff here concedes that

13   Nevada does not define, quote/unquote, work or compensable work.

14   Instead, it asked this Court to look to the FLSA definition of

15   work in cases like Steiner to be that gap filler.

16           That is the major disconnect in plaintiff's arguments

17   because the FLSA body of case law on compensable work is not

18   separable from Portal -- the Portal-to-Portal Act analysis.  In

19   other words, plaintiff --

20           **THE COURT:**  I mean, I -- I read on the -- the *In Re:*

21   *Amazon* case --

22           **MR. PAEK:**  Yes.

23           **THE COURT:**  -- Fifth Circuit MDL case.

24           **MR. PAEK:**  Yes.

25           **THE COURT:**  I mean, that case fairly carefully parses

1  this issue about differentiating between what is work and what is

2  compensable work under the FLSA --

3           **MR. PAEK:**  Yes.

4           **THE COURT:**  -- and signals that there is a

5  distinction there; that --

6           **MR. PAEK:**  So --

7           **THE COURT:**  -- Nevada requires that work be paid;

8  that the FLSA, sort of, more narrowly makes exceptions to more

9  narrowly apply what actually must -- not just what is work but

10 what is compensable; and that there's no analog in the Nevada law

11 for that and actually may conflict with the requirement that all

12 work get paid.

13          **MR. PAEK:**  So, what I would say to that, Your Honor,

14 is the *In Re: Amazon* analysis doesn't -- doesn't talk

15 about -- doesn't talk about why 608.016's language is conflicting

16 with what the FLSA has as work or compensable work.

17          In other words, in other words, it doesn't -- unlike

18 what the Nevada Supreme Court held in the *Dancer v. Golden Coin*

19 and *Thomas v. Yellow Cab*, those are the two cases where Nevada

20 did find conflict.  And what they cited to in those cases, for

21 example, in *Dancer*, Nevada has an exclusion of tips from the

22 minimum wage whereas the FLSA requires -- gives you a tip credit.

23          And there, they said that is an example of

24 conflicting language.  We have two totally opposite terms and two

25 totally different opposite meanings.

1          In *Thomas v. Yellow Cab*, there was a similar analysis

2  because what happened when the Minimum Wage Amendment or the MWA

3  was passed into the Nevada constitution, it actually had a

4  different exception list to what existed before in the

5  preexisting NRS 608.260 minimum wage exceptions list.

6          In that case, the issue was whether or not drivers

7  were still included when they weren't included on this new list,

8  and that was another example where the Nevada Supreme Court said

9  it's clearly conflicting.

10          So I think that's where it has to stand, Your Honor,

11  is that it has to be clearly conflicting.  It has to -- there has

12  to be an analysis that -- it clearly cannot fit into the same

13  meaning that because it's the opposite, then they can't stand

14  together.

15          So, in other words, plaintiff here --

16          **THE COURT:**  Wait.  Say that again.  Because they can

17  be the opposite and not conflict --

18          **MR. PAEK:**  They have to be the opposite of each other

19  to be conflicting.  In other words, in other words, when looking

20  at the -- in other words, is 6 -- there anything in 608.016 that

21  is clearly the opposite of what would be the definition of work

22  in the FLSA?

23          And that's what they can't point to.  They can --

24  they --

25          **THE COURT:**  Since there is no conflict on the

1  definition of work --

2          **MR. PAEK:** But that's -- yeah. That's what we're

3  talking about here. There is -- yeah. It's silent as to work is

4  what the NRS is, and that's really what we have to zero in on

5  because that's what the argument here is, is not about

6  the -- it's about the definition of work and what is the

7  definition of compensable work.

8          And so, that's why plaintiff here can't pick and

9  choose one part of the FLSA and then ignore another part. That's

10  wrong. Nevada looks to the FLSA and its amendments and developed

11  case law, as enunciated, to see whether or not there is a

12  conflicting or materially different statute, and if there's not,

13  then we just adopt it.

14          Here, the parties do not dispute that we must look to

15  what the Nevada Supreme Court would decide since all of the

16  claims are made under the Nevada statutes and NRS 608 or the

17  Minimum Wage Amendment.

18          Plaintiffs also do not dispute that Nevada modelled

19  its minimum wage in 1965, the predecessor statute, NRS 608.250,

20  and overtime laws in 1975 after the FLSA and the Portal-to-Portal

21  Act was passed in 1947. That's decades after those federal laws

22  were passed and developed.

23          Thus, in *Terry v. Sapphire,* which this Court has to

24  look at, the Nevada Supreme Court examined whether or not

25  Sapphire's performers were employees subject to the Nevada

1    minimum wage or independent contractors outside the scope of

2    employees.

3                    And I think this is where the *Terry* analysis is very

4    instructive for this Court, Your Honor, because when examining

5    the definitions -- and this is what I alluded to earlier -- of

6    employer in 608.011 with definition of employer in the FLSA, the

7    Nevada Supreme Court did note that those definitions were

8    different.  However, they weren't materially different enough to

9    change the adoption of the Economic Realities Test, which like

10   the integral and indispensable test here, arises from the case

11   law that has been developed off the FLSA and not the actual

12   language that's in the statute.  All that analysis should apply

13   here.

14                   In *Terry*, the Nevada Supreme Court did not show any

15   NRS statute that adopted the Economic Realities Test.  That's

16   what they're saying needs to be done here.  It would turn *Terry*

17   on its head, because *Terry* -- because there is no NRS statute in

18   608 or anywhere that references the Economic Realities Test.

19   That's the same analysis, just like, for example, it's a

20   variation of their argument.  There is no language in the

21   definitions section of NRS 608 that expressly adopts the FLSA

22   definition of work.

23                   You can use that same argument against their

24   arguments that if there's no -- if there's no statute in NRS 608

25   referencing the FLSA at all, why should we adopt the FLSA at all?

 1          And NRS -- if they want to just rely on the Motor

 2   Carrier Act exemption, then really what their argument stands for

 3   is only when you reference something directly should it be

 4   adopted.  That means all of NRS 608 would not on -- on FLSA.  It

 5   would just be the Motor Carrier Act exemption.  And that's not

 6   the -- that's not the case, and that's not what the Court

 7   detailed in *Terry v. Sapphire*.

 8          That's why the conflicting or materially different

 9   analysis is so important to see whether or not -- in other words,

10   there's an assumption.  There's an assumption that if those are

11   not there, all of our statutes are modelled after FLSA.  We're

12   going to be consistent with it.

13          Thus, since plaintiff cannot cite any language in

14   Nevada overtime or minimum wage that conflicts with or is

15   materially different than the FLSA as to work, this Court must

16   follow the Portal-to-Portal Act and the integral and

17   indispensable test.

18          Now, that test, as laid out by the U.S. Supreme Court

19   in --

20          *(Whereupon, the reporter interrupts to preserve the*

21          *record.)*

22          **THE COURT:**  Slow down.

23          **MR. PAEK:**  Sorry.  -- in *Busk v. Integrity*, that the

24   first step of the Portal-to-Portal Act analysis is pinpointing

25   the, quote, principal activities, meaning the activities that the

1  employee's employed to perform.  Here, plaintiff --

2        **THE COURT:**  Let me just ask you a question.  If you

3  go back, so you're talking now about the Portal-to-Portal Act and

4  this -- the, sort of, whether this is compensable work.

5        **MR. PAEK:**  Yes.

6        **THE COURT:**  Can you just address the definition of

7  work in terms of -- are you conceding that this was primarily for

8  the benefit -- like the definition of work before you get to

9  Portal-to-Portal Act, do you concede that Amazon -- that this was

10  primarily for Amazon's benefit on that part?

11        **MR. PAEK:**  No.  And I --

12        **THE COURT:**  Can you address that?

13        **MR. PAEK:**  Yeah, I can.  I can address that, Your

14  Honor.

15        **THE COURT:**  Thank you.

16        **MR. PAEK:**  Even under the primarily for the benefit

17  analysis, plaintiff's claims fail.  In its complaint, plaintiff

18  acknowledges that the COVID virus killed more than 900,000

19  Americans, and COVID screenings were to provide a safe workplace.

20        Reducing the spread of COVID was a benefit, not only

21  to plaintiff, but also a benefit to many people both inside and

22  outside Amazon.

23        Employees received the benefit of staying healthy.

24  Their families and friends received the same benefit.  The

25  community, in general, benefitted from reducing the spread of

```
 1   COVID.  Customers and the community received the benefit of

 2   having an alternative provider of goods when in-person goods were

 3   limited and restricted.

 4             Plaintiff alleges that Amazon had the benefit of a

 5   healthy workforce.  While this is true, this is, by definition,

 6   secondary to all of those other benefits to health because that's

 7   what COVID screenings are for.

 8             At most, taking that all into account as to Amazon

 9   and its employees, there was a secondary or mutual benefit.  But

10   that doesn't meet the "primarily for the benefit" standard, and

11   that analysis is similar to the analysis done by the Perez v.

12   Walmart court, where they looked at COVID screenings for Walmart

13   employees.

14             THE COURT:  Can I just ask you, in -- was Amazon

15   required by law to implement COVID screenings --

16             MR. PAEK:  So --

17             THE COURT:  -- in order to keep --

18             MR. PAEK:  -- so the regulations that are attached to

19   our motion, Your Honor, and the directive did not specify COVID

20   screenings.  What they -- what the government mandated were that

21   employees -- and we're all in this together -- come up

22   with -- come up with ways to reduce exposure.

23             And, of course, as this Court is well aware, as

24   everyone who lived through the pandemic was aware, that included

25   a combination of things.  It could be thermal screenings.  Some
```

1  employers did that.  Some employers didn't.  But it was a

2  combination of social distancing, masking, restrictive

3  workspaces.  You know, there was a combination of --

4          **THE COURT:**  But is it your position that Amazon could

5  have, as an essential business, under Nevada law -- and I realize

6  it may be more finely sliced in terms of exactly what period

7  we're talking about.

8          But was it your -- is it your position that Amazon

9  could keep its doors open, consistent with legal directives in

10  Nevada at the time, and do no screening at all --

11          **MR. PAEK:**  Well --

12          **THE COURT:**  -- none?

13          **MR. PAEK:**  -- so that's part of the -- that's part of

14  the presumption that's made in the -- in the allegations that

15  thermal screenings -- so to -- to assume that, you would have to

16  assume that thermal screenings and thermal screenings alone

17  prevented any COVID outbreak that leads to the scenario that they

18  talk about in this complaint that would have had a mass outbreak

19  in the workforce that would have caused an immediate disruption

20  or shutdown.

21          We haven't seen that.  That's what they --

22          **THE COURT:**  I just -- I just want an answer to the

23  question.

24          Could -- is it Amazon's position that during the

25  pandemic, the entire period, so regardless of -- you know, I

1   realize different things may have been in effect at different

2   times.

3          But is it Amazon's position that it could have

4   kept -- as an essential business, it could have kept its doors

5   open to its warehouses without implementing any COVID screening

6   procedure, not necessarily the one that was implemented, but that

7   you could -- that Amazon had the choice to keep its doors open

8   during that period and could have done nothing and complied with

9   Nevada legal directives --

10          **MR. PAEK:**  So -- so -- I understand your question,

11   Your Honor.  But not doing the thermal screening, yes.  My answer

12   would be yes because that wasn't the only thing they did.

13          So, in other words, that question hinges on whether

14   or not thermal screenings alone would have prevented outbreaks.

15          Could they have done alternative measures without the

16   thermal screenings such as they did -- social distancing?

17   Employee self-reporting?  Not coming to work when they're sick?

18   Were all those factors?

19          Those all have to be considered and included in that

20   analysis because all of those were -- although their complaint

21   just focuses on the thermal screenings alone, Amazon actually did

22   a variety of things that all contributed to that --

23          **THE COURT:**  Right.  But my question is, wasn't there

24   a legal requirement to do something, even if Amazon may have --

25          **MR. PAEK:**  Yes.  But --

 1            THE COURT:  -- had a choice about what that was?

 2            MR. PAEK:  But the mandate was not that they had to

 3  do thermal screenings.  That was one option --

 4            THE COURT:  They had to do something?

 5            MR. PAEK:  They had to do -- yeah.

 6            THE COURT:  Then Amazon chose that something to be

 7  the thermal screenings that are being challenged --

 8            MR. PAEK:  Along -- along with everything else.

 9            THE COURT:  Right.

10            MR. PAEK:  Along with everything else.

11            THE COURT:  I'm just trying to situate this case

12  different from -- it's different from the antitheft screenings in

13  the sense that no one told --

14            MR. PAEK:  Oh.

15            THE COURT:  -- Amazon that it had to screen for

16  theft --

17            MR. PAEK:  That's true.  That's correct, Your Honor.

18            THE COURT:  -- and that was 100 percent, you know, a

19  choice that Amazon made.  Whereas here, Amazon may have had a

20  choice about how to implement COVID-19 procedures of some kind,

21  but it didn't have a choice about whether to do nothing or

22  something.  It had to do something.

23            MR. PAEK:  That's correct, Your Honor --

24            THE COURT:  Okay.

25            MR. PAEK:  -- that's correct.

1           So as Your Honor alluded to, yeah.  You know,

2     that -- that goes back -- that goes back to what is the -- that

3     touches on the -- the *Busk* analysis.  As Your Honor pointed out,

4     the security screenings are different than was ordered here.

5     However, the underlying activity is the same in both cases.  And

6     that's why that case is so instructive.

7           In other words, what was their principal activity?

8           So in the *Busk* case, the U.S. Supreme Court focused

9     on -- okay.  The Ninth Circuit ruled that activities that are

10    necessary can be included, but the U.S. Supreme Court said really

11    what we need to first focus on is the principal activities.  That

12    means the activities that the employee's employed to perform.

13    And in that case, like here, similarly, in his amended complaint,

14    plaintiff alleges that the tasks that he was assigned to was,

15    quote -- in paragraph 14 of his complaint -- moving boxes,

16    stacking packages, and loading boxes.

17          He does not allege that Amazon employed him to get

18    his temperature checked or answer questions about COVID,

19    obviously.  Thus, screenings were both separate from and

20    preliminary to plaintiff's principal activities, meaning it is

21    compensable only if it is both, quote, integral and indispensable

22    to his principal activities --

23          **THE COURT:**  Can I just stop you for a second?

24          So now you're talking again about the compensable

25    aspect?

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023      17

1            **MR. PAEK:**  Yes.

2            **THE COURT:**  And before, I was just sort of

3    backtracking a little bit to go to the primarily a benefit to

4    Amazon.

5            I just want to ask you, so Amazon was an essential

6    business during the pandemic --

7            **MR. PAEK:**  Yes.

8            **THE COURT:**  -- that was allowed to keep its doors

9    open?

10           And, I guess, either in Nevada or elsewhere, did

11   Amazon close any of its warehouses during the pandemic due to,

12   sort of, a workforce-related --

13           **MR. PAEK:**  Yes.  Those are not in the facts.  I

14   do -- I do -- those aren't in the facts for Nevada.  I don't have

15   all the -- all the --

16           **THE COURT:**  Okay.

17           **MR. PAEK:**  -- information on the other facilities.

18           So going back to the -- briefly to the *Busk* analysis,

19   Your Honor, it -- the COVID screenings don't satisfy either prong

20   of the integral and indispensable test because integral, as laid

21   out in *Busk*, is an intrinsic element of principal activities

22   while indispensable means an employee cannot dispense with it if

23   he is to perform his principal activities.

24           The underlying activity here, as stated, is the same

25   as in the *Busk* court.  So there, in *Busk*, the Court held that

1   they were, quote, not an intrinsic element of retrieving products

2   from warehouse shelves or packaging -- packaging them for

3   shipment and that they could have, quote, been eliminated without

4   impairing the employee's ability to complete their work.  Thus,

5   the security screenings in that case were noncompensable

6   preliminary -- postliminary activities.

7            But here, the analysis is the same.  First, getting a

8   temperature check and answering questions about COVID-19 symptoms

9   or exposure were not integral to plaintiff's principal activities

10  because those screening measures are not intrinsic elements of

11  moving, stacking, or loading boxes.  And second, the alleged

12  screening procedures were also not indispensable to plaintiff's

13  principal activities because plaintiff still would have been able

14  to move, stack, and load boxes had Amazon eliminated those

15  procedures.

16           And this is the same analysis that the *Pipich v.*

17  *O'Reilly Auto Parts* court applied --

18           **THE COURT:**  Are those -- that *Busk* analysis, just to

19  be clear, that was based on an FLSA claim, and now we're just

20  looking at Nevada claims?

21           **MR. PAEK:**  Yes.  But the --

22           **THE COURT:**  All of that sort of hinges on the

23  Portal-to-Portal Act applying --

24           **MR. PAEK:**  Yes.

25           **THE COURT:**  -- to this specific kind of work?

1            **MR. PAEK:**  That Nevada looks to the FLSA and

2    incorporates the Portal-to-Portal Act.  That's correct.

3            **THE COURT:**  Okay.  I guess I -- I understand that

4    integral and indispensable analysis sort of tethering the

5    specific overlay of -- of some kind of a screening to the job.  I

6    guess -- and I realize that the Portal-to-Portal Act covers

7    postliminary -- preliminary and postliminary activities.  But

8    this is a little bit different, because if Amazon doesn't have a

9    screening procedure -- granted, it may not be this screening

10   procedure.

11           But if it doesn't have any workers to do the work, is

12   it -- does it, then, become, sort of, integral and indispensable

13   to the job?

14           I mean, I think Amazon -- if the governor said, If

15   you don't do this screening or some kind of screening, you are

16   not going to be allowed to operate your warehouses, I think that

17   Amazon would likely be making an indispensability argument to the

18   governor about whether this has to be done.  So I'm just

19   wondering if that translates to the actual --

20           **MR. PAEK:**  Yeah.  That kind of goes back to what Your

21   Honor was touching on earlier about the benefit argument.

22   And -- and really, if I can -- if I can elaborate a little bit

23   more on that, that's where, I think, we're comparing the *Boone*

24   and *Vaccaro* reasoning versus the cases we've cited, which are

25   *Pipich v. O'Reilly Auto Parts*, *Perez v. Walmart*.  And I think

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023     20

 1   when the Court looks at those cases, we've got cases on both
 2   sides doing the analysis with basically the same set of facts.
 3              And so, what -- what should the Court look to, to see
 4   what is the "primarily for the benefit of"?
 5              And I think the key to it is that none of those cases
 6   are binding on this Court.  They're all persuasive.  So if
 7   they're all persuasive, I think it really gets to, well, how deep
 8   was the analysis on the "primarily for the benefit" on each side,
 9   and what did one Court point out that the other Court didn't
10   address?
11              And I think that's where *Pipich v. O'Reilly Auto*
12   *Parts* and *Perez v. Walmart* are clearer, because they delve deeper
13   into the "primarily for the benefit" analysis.  They talk, as
14   this Court alluded to earlier, as the government mandate being a
15   part of it, about the benefits to the community.  And they kind
16   of looked at it overall and looked at all of those and said,
17   Well, in the wash, in *Perez v. Walmart*, we think the closest it
18   comes down to is a mutual benefit, and that's not enough.
19              That's -- we would -- they held that there is a
20   benefit to the employee, there is a benefit to employer, but that
21   doesn't meet the test.  And I think -- I think that analysis and
22   the *Perez* analysis and the *Pipich* analysis get a lot closer to
23   considering all those factors, whereas *Boone* doesn't.
24              It's -- and it's -- you know, Your Honor's kind of
25   touched on this with the -- the government mandates.  It's not as

1   if the COVID screenings were a practice, you know, unique to

2   Amazon as a business, either.  I mean, employers of all types,

3   public institutions, even individualized citizens were all

4   screening from the same virus in different areas and all

5   benefitted from those combined efforts.  Our community all

6   benefitted.

7           So, in sum, it can't be just recharacterized as

8   primarily for the benefit of Amazon, and I think that's what the

9   *Perez* court touched on --

10          **THE COURT:**  I guess, I would -- it might look a

11  little different factually if the screenings were happening when

12  the workers left the factory.  Then you could argue that that

13  benefit is sort of for the community or their families, right, to

14  make sure it's not coming, sort of, on the tail end of the work

15  as opposed to the beginning.

16          It might be a little different if we're talking about

17  precautions that are specific to Amazon delivery people.  And I

18  realize that plaintiffs have made a sort of -- the suggestion

19  that, like, a virus can travel in packages.  I think that's

20  probably not accepted science at this time anymore, but -- but if

21  we're looking at something that's more on the back end.

22          But what we're looking at is when you walk into the

23  warehouse door about activity keeping the warehouse safe and

24  other employees safe, that's -- and with the caveat that people

25  could be sent home and you need to have another worker who passed

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023     22

 1   those screening tests.  But if it -- it does seem that Amazon

 2   can't keep its -- can't operate its warehouse at capacity if it

 3   doesn't have the worker -- workforce ready to go.

 4            **MR. PAEK:**  Well, I mean, I think that goes, kind of,

 5   to how -- kind of, like, how to effectively prevent outbreaks.  I

 6   guess, the --

 7            **THE COURT:**  Outbreaks at the warehouse?

 8            **MR. PAEK:**  Yeah.  I mean, I guess, the corollary to

 9   that is if you were to wait till the end of the day, I mean,

10   there's a chance that someone could bring it in.  And so, I mean,

11   it gets back to what were, kind of, the collected community's

12   thoughts on what -- what one preventative measure that can be

13   instituted and that can be a part of this, kind of -- these other

14   preventative measures as a whole to just try to reduce bad effect

15   on people's health.

16            And I -- I get what Your Honor's saying, but I

17   think -- I think the idea is that if the infected person comes in

18   to begin with, that kind of -- it's not going to be cured on the

19   back end, I guess, is the --

20            **THE COURT:**  Right.  But I just -- the location and

21   timing of the screening makes a difference in terms of who is the

22   primary beneficiary of that screening, because Amazon -- I think

23   there's an argument to be made that Amazon is not doing this for

24   the public welfare, and Amazon is not doing this for the

25   families.

1           Amazon -- I can see your argument, it may be

2  beneficial to the workers that workers are coming to a place that

3  is -- where they're not going to be infected by other workers.

4  But it does seem like the location is specific to making sure

5  that Amazon can have its warehouses operating and keep sickness

6  out of its warehouses, not --

7           **MR. PAEK:**  I mean, I -- yeah.  I don't think it can

8  be -- I understand what Your Honor's saying.  I don't know that

9  it can be parsed out like that, because I think -- I think the

10 screenings always went to both.  I mean, it always -- it wasn't

11 just -- it was also a means to protect the health of workers and

12 prevent uninfected workers from possibly coming to a place where

13 they might get infected.

14          I understand that it's kind of connected and

15 intertwined there --

16          **THE COURT:**  Right.

17          **MR. PAEK:**  -- but I don't know if --

18          **THE COURT:**  I mean --

19          **MR. PAEK:**  -- I don't know if it can be just

20 separated out as to just Amazon's operations without including

21 that component --

22          **THE COURT:**  Right.

23          **MR. PAEK:**  -- because the reality is that Amazon

24 without -- without COVID operated without any of that.  So --

25          **THE COURT:**  Right.  But I -- but it may just be that

1  those issues are more factually complex than what might be, sort

2  of, sorted out at a motion to dismiss stage like in *Vaccaro*.

3          **MR. PAEK:**  Well, I mean, I understand what Your

4  Honor's saying.  I think that's -- that's where -- I think

5  that's -- as I mentioned earlier, I think that's where the

6  analysis done by other courts looking at *Busk*, looking

7  at -- looking at the same COVID screenings in *Perez v. Walmart*

8  and *Pipich*, I think that's where they considered the same factors

9  that this Court should consider.  And I think -- I think that's

10 where the analysis should kind of lay is -- is the Court kind of

11 looking at those analyses and seeing which ones are the most

12 complete.

13         **THE COURT:**  Okay.  You might want to just

14 spend -- I'm going to give you some time for rebuttal, but you

15 might just want to address to the -- so much of this, kind of,

16 has -- of the four claims really hinges on the definition of work

17 and whether we're looking at work or compensable work under the

18 FLSA.

19         But if there's anything specific to the minimum wage

20 overtime termination issues, maybe you could address that.

21         **MR. PAEK:**  Sure, sure, Your Honor.

22         So I think -- well, as Your Honor is already aware,

23 those -- those compensability issues are kind of the crux of it,

24 and the rest of our arguments are alternative arguments should

25 the -- should the Court find otherwise.

1            So as to the 608.016 argument, the minimum wage,

2    overtime, 608.050, I can briefly touch on those.  The 608.016, as

3    I -- as we talked to at the beginning of the hearing, that

4    language can't, as I said, be looked at through a vacuum.  The

5    Nevada Supreme Court says not to look at statutes through a

6    vacuum.

7            And really, there is a question as to what it stands

8    for.  It was passed in 1985, and the statute, if -- if you look

9    at the legislative history, has always stood for the fact that

10   they wanted to make sure that trial and breaking periods were not

11   excepted from work -- for each hour of work.

12           So as I talked about earlier, that statute's been

13   amended since then by 608.0195 and 608 --

14        *(Whereupon, the reporter interrupts to preserve the*

15        *record.)*

16        **MR. PAEK:**  608.0195 and NRS 608.215.  And those

17   statutes deal with sleep periods for employees working at a group

18   residential facility or domestic household employees and whether

19   or not their meal and sleep period can be excluded by agreement

20   with the employer from work.

21           So I would -- I would state to the Court that in line

22   with the legislative history, those are very different issues of

23   periods of time than what the plaintiff is trying to argue here,

24   because what the plaintiff is arguing for is what's known in

25   other jurisdictions and under the FLSA as gap time or straight

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023    26

1   time --

2           **THE COURT:**  Right.  There is -- there is language

3   here.  I mean, this statute, 608.016, says, with the exception of

4   those two provisions that you just mentioned, An employer shall

5   pay to the employee wages for each --

6           **MR. PAEK:**  Uh-huh.

7           **THE COURT:**  -- hour the employee works, period.

8           How -- so it's important to give force to that

9   language.

10          **MR. PAEK:**  And to give force to that, you have to

11  read it with the second sentence, which is, An employer shall not

12  require an employee to work without wages during trial or

13  breaking period.

14          And as to a question as to, well, does it just mean

15  that first sentence and that sentence alone, or does it combine

16  with the second one?  That's why we look to the legislative

17  history.  And that's why, when looking at the legislative

18  history, it becomes clearer that that's what they were talking

19  about.  It's not the best worded statute, but it's a far cry from

20  the gap time statute that they want.

21          And an example of that, Your Honor, is in their

22  amended complaint, because in paragraph 61 of their amended

23  complaint, they have, under their elements for their NRS 608.016

24  claim, what they want.  They say, quote, Plaintiff demands

25  payment by defendant at their regular hourly rate of pay or the

1  minimum wage rate, whichever is higher, for all hours worked

2  during the relevant time period.

3          That is like a gap time statute, Your Honor, where

4  it's filling in the gaps between what is minimum wage and

5  overtime.  And this language, what they're asking for as part of

6  their 608.016 is nowhere in the statute of 608.016 or the

7  legislative history.

8          That's why what their -- their claim is really -- is

9  trying to recharacterize 608.016 to a gap time claim, and there's

10  no legislative history or language in the statute for that.

11  That's the problem.

12          **THE COURT:**  So if you -- okay.  Let's -- let's say, I

13  was reading this paragraph 61, and I was just taking out of the

14  equation what rate would be appropriate but solely looking at the

15  request to be paid for all hours worked.

16          Would -- that is a 608.016 claim --

17          **MR. PAEK:**  In -- in the context of all hours worked

18  includes trial and breaking periods and then amended again to

19  say, sleep and meal -- sleep periods and meal and sleep periods

20  will not be excluded, unless there's agreements and you meet

21  these exceptions.  That's all -- that's all part of that statute,

22  too --

23          **THE COURT:**  Do you have a case that actually parses

24  this point you're making about --

25          **MR. PAEK:**  So --

1          **THE COURT:**  -- how all hours worked means something

2  other than all hours worked? because I think it's fair to read

3  that second sentence as saying all hours worked means all hours

4  worked and doesn't exclude this category and doesn't exclude

5  another category.

6          **MR. PAEK:**  So the best we have, Your Honor, is the

7  actual legislative history of 608.016 --

8          **THE COURT:**  Right.  But I don't need legislative

9  history if I can look at the statute.

10         **MR. PAEK:**  Well, that's -- that's the disagreement on

11  the statutory language --

12         **THE COURT:**  Okay.  Fine.

13         **MR. PAEK:**  Yeah.  So going back to the other

14  alternative arguments, Your Honor, there's the minimum wage

15  calculation and whether or not they met the -- standard for a

16  calculation.  That's a pretty straightforward argument that even

17  under -- whether it be FLSA law or Nevada law, through the Nevada

18  regulations promulgated by the labor commissioner and nothing in

19  the -- to the contrary in the Nevada statutes that whenever

20  you're trying to determine minimum wage, you use the workweek

21  method of calculation.

22          Under both Nevada and federal law, employers can

23  avail themselves to what is known as peace rate payment or other

24  alternative forms of payment.  And both federal authorities and

25  Nevada regulations have held that whenever that is done, you take

1 the amount of hours worked and -- I mean, you take the amount of
2 pay given, and you divide it by the hours worked to get a regular
3 rate.
4          And that's the problem in this case is that the upper
5 tier rate in 2020, which was the maximum rate that plaintiff had,
6 was $9 per hour.  Plaintiff was always paid at a 15- to
7 16-dollar-an-hour rate.  He does not dispute that he was paid
8 overtime for the weeks where he worked 50 hours.
9          A straight calculation of that shows that it doesn't
10 meet the one-and-a-half time threshold, so they haven't shown a
11 minimum wage violation because they haven't shown that he dipped
12 below the minimum wage at any time during his work.
13          **THE COURT:**  But you would agree just with the
14 province that the plaintiff wasn't paid at all for the COVID
15 screening times that he's challenging --
16          **MR. PAEK:**  So --
17          **THE COURT:**  -- right --
18          **MR. PAEK:**  -- so --
19          *(Whereupon, the reporter interrupts to preserve the*
20          *record.)*
21          **MR. PAEK:**  I'm sorry, I'm sorry.
22          As part of that calculation, Your Honor, we
23 incorporated that if you were to take his maximum of his
24 allegations and plug those in, he still doesn't meet -- he still
25 doesn't dip below the minimum wage threshold.  So we're kind of

 1  giving him the benefit of the doubt there --

 2          **THE COURT:**  I see.

 3      **MR. PAEK:**  -- on that argument, not for the rest.

 4      **THE COURT:**  Got you.

 5      **MR. PAEK:**  To the NRS 608.018 weekly overtime

 6  argument, this goes back to the Ninth Circuit standard of *Landers*

 7  *v. Quality* for how do we determine wage violations under the

 8  (indiscernible) standard.  And the *Landers* case held that what

 9  the Court should do is look at a specific workweek to see if

10  there's a plausible violation and that generalized allegations

11  are not enough.

12          Here, in this case, it kind of exemplifies what the

13  problem is because in his allegations, he's alleged that the

14  screenings took 10 to 15 minutes, and what's inherent in those

15  are those are kind of the maximum end screenings, which are like

16  you don't pass the handheld thermal and then you go to a second

17  step, where you would have to do an additional screening.

18          And the question is, well, did this plaintiff, as a

19  named representative for a proposed class action, actually

20  experience that violation?  Did he have a workweek -- and that's

21  why it's so important in this case, especially.

22          For example, would his allegation be, On this certain

23  week, I did secondary screenings four out of the five days, which

24  make me beyond that threshold that were 15 minutes each?

25          That would be very different than him specifying a

 1   workweek that said, Well, four to five days, I did ten-second

 2   screenings each day and never got to secondary screening.

 3          Those facts matter as to whether or not he passes

 4   that plausible threshold.

 5          **THE COURT:**  Uh-huh.

 6          **MR. PAEK:**  So that's basically, in a nutshell, the

 7   NRS 608.018 argument.

 8          And then, finally, the 608.020 through .050 argument

 9   is -- can be very -- can be a lot to look at.  But I would say

10   this.  First of all, it's -- as we pointed out, it's derivative,

11   so if the other claims don't hold up, we don't have to look at

12   it.

13          But, in the alternative, if any claims are -- get

14   through, the 608.020 through .050 has not -- was never meant to

15   apply to a situation where off-the-clock work is alleged and the

16   employer has never been given an opportunity to cure.  And the

17   reason for that is in the language of NRS 608.020 through .050 --

18   and those statutes were all passed at the same time, except for

19   .050, I believe.  608.020 through .040 were passed in 1919, and

20   608.050 was passed in 1925, I believe.

21          And at the time, they were called the final paycheck

22   statutes, and the reason why those statutes were passed in the

23   legislative history was because the Nevada legislature -- it was

24   actually in the construction context -- found that construction

25   employers would basically have someone work on a project for

1   many, many months, and they would stiff them on the last paycheck
2   because they're like, The likelihood of me using that worker
3   again was not very high, so I'll just not pay them the final
4   paycheck.
5           So the Nevada legislature instituted these penalties.
6   But the key to those provisions is they come into play when an
7   employee is terminated or quits, so it's only upon separation of
8   employment, but then it's 30 days of continuing rate damages
9   until paid, whichever is first.
10          So, in other words, what's contemplated in that
11  statute is that when it becomes due, an employer can get that,
12  look at that, and say, Well, I owe them that money.  I don't want
13  to keep accruing --
14          **THE COURT:**  Uh-huh.
15          **MR. PAEK:**  -- these penalties for the 30 days --
16          **THE COURT:**  Right.
17          **MR. PAEK:**  -- and I want to just pay them out.  I'll
18  pay two weeks of penalties, or whatever it may be.
19          Applying it to a case like this, where there has
20  never been an amount due, basically takes that cure provision
21  completely away from employer and makes it automatic,
22  unless -- unless the other alternative is that it really doesn't
23  become due until a court like this says it becomes due.  And
24  that's when an employer's assessed it, and that's when they could
25  pay it off.  So that's kind of the argument on that.

 1              I'll be happy to answer any questions on any of the

 2    NRS 608 arguments, but I would like to reserve for rebuttal.

 3              **THE COURT:**  Please.

 4         **MR. PAEK:**  Thank you.

 5         **THE COURT:**  Thank you very much.

 6         **MR. PAEK:**  Thank you, Your Honor.

 7         **THE COURT:**  Go ahead --

 8         **MR. FOTY:**  May I, Your Honor?

 9         **THE COURT:**  Yes.  Thanks.

10         **MR. FOTY:**  Your Honor, this case presents very few

11    issues that have not already been decided by prior courts.  In

12    fact, nearly every one of Amazon's arguments have already been

13    rejected in prior decisions.  And Amazon is now asking you to

14    take the extraordinary step in disregarding all of those prior

15    decisions.

16              Now, Your Honor, in terms of background, following

17    the pandemic, Amazon instituted a company-wide policy, requiring

18    all of its warehouse workers across the country, including in

19    Nevada to line up at the start of their shifts, to stand six feet

20    apart, and to go through a health screening one by one, pass that

21    health screening, and then walk hundreds of feet away to go clock

22    in.

23              If they passed the health screening, they were

24    allowed to clock in.  All of that time was spent off the clock.

25              Given that Amazon did not pay any worker for the time

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023    34

 1  spent going through the health screening, lawsuits were filed

 2  against Amazon across the country.

 3          You have the *Vaccaro* case, which was brought in New

 4  Jersey under New Jersey law.  You have the *Boone* case in

 5  California, which was brought under the Fair Labor Standards Act

 6  and under California law.  You have the *Vincenzetti* case, which

 7  is suing Amazon for the same thing under Colorado law, and you

 8  have the *Johnson* case now, which is suing Amazon for the same

 9  thing under Illinois law.

10          Now, Your Honor, in each of those cases with the

11  exception of the *Vincenzetti* case and the *Johnson* case, which was

12  recently filed, Amazon moved to dismiss the screening claim

13  saying it's not compensable.  And those cases, the courts

14  rejected their argument.

15          So to date, there's not been one case that has

16  supported the arguments that Amazon is now making today.  I'll

17  start with the Portal-to-Portal Act because I think that's --

18  that's what gets us -- that's -- essentially, that's the easiest

19  way to reject Amazon's arguments is to address whether or not

20  Nevada law has incorporated the Portal-to-Portal Act.

21          And, Your Honor, as I mentioned earlier that every

22  argument that Amazon is making has been rejected, well, Amazon's

23  argument that Nevada law has incorporated the Portal-to-Portal

24  Act has already been rejected.  And it was rejected in *In Re:*

25  *Amazon* by the Ninth Circuit.

1              So, *In Re: Amazon* was an MDL, where multiple lawsuits

2    were filed against Amazon for post-shift security -- post-shift

3    theft screenings.  They're all consolidated into an MDL.  And the

4    issue of what was compensable in each of the various cases went

5    up to the Sixth Circuit.

6              And the Sixth Circuit carefully looked at Nevada law

7    and looked at the text of the Nevada law and compared it to the

8    text of the FLSA.  And the Sixth Circuit held that the text of

9    the -- of Nevada law and the FLSA regarding what is compensable

10   are materially different, and there's no indication that the

11   Nevada legislature ever adopted an exclusion for compensable

12   work, like the Portal-to-Portal Act, under Nevada law.

13             **THE COURT:**  So just step back for a second.

14             In the MDL case, in *In Re: Amazon*, that was -- by

15   that -- that's the same case that went to the Supreme Court on

16   the FLSA issue.

17             **MR. FOTY:**  On the FLSA issue.

18             **THE COURT:**  And then, by the time the Sixth Circuit

19   is getting that case, the FLSA issues are out.  They're not

20   compensable because of what the Supreme Court said.

21             **MR. FOTY:**  That's right.

22             **THE COURT:**  And the In Re -- and the Sixth Circuit

23   was solely looking at claims similar to these in terms of whether

24   this is work.

25             **MR. FOTY:**  Whether it is work, whether it is work --

 1             **THE COURT:**  Yes.

 2             **MR. FOTY:**  -- exactly.

 3             So the distinction is that the FLSA broadly defines

 4   work.  And under the FLSA, anything that's controlled or required

 5   by employer and done primarily for the benefit of the employer,

 6   that's work.  Okay?

 7             But when the FLSA was first enacted back in 1937,

 8   employers petitioned congress and said, Look, that definition of

 9   work is too broad.  Okay?

10             So Congress then enacted the Portal-to-Portal Act.

11   The Portal-to-Portal Act did not change the definition of work.

12   What the Portal-to-Portal Act then said is, Look, not everything

13   that is work has to be paid for by the employer.  And that's the

14   critical distinction is that the FLSA broadly defines work and

15   then draws a distinction and says, Look, even if it's work, it

16   may not have to be paid for, and the Portal-to-Portal Act tells

17   you what type of work has to be paid for.  Okay?

18             So now you look at Nevada law.  And Nevada law --

19   well, defense counsel is correct.  The Nevada law has not defined

20   work.  So in that circumstance, Nevada law can look to the FLSA,

21   because we're looking at what is the definition of work, and work

22   is broadly defined.

23             Anything that's controlled or required by an employer

24   and done primarily for the benefit of the employer, that's work.

25   But here's the critical distinction is that Nevada law

1  specifically states -- and there's no language in the FLSA that

2  says this.

3            Nevada law specifically states, An employer shall pay

4  the employee wages for each hour the employee works.

5            And it specifically defines what an employer has to

6  pay for, and it says, You have to pay for every hour when an

7  employee is doing work.

8            There is no corollary, whatsoever, in the FLSA.  In

9  fact, that language under 608.016 is materially distinct than the

10  language in the Portal-to-Portal Act.  You can't reconcile the

11  two.

12            Now, defense counsel was saying --

13            **THE COURT:**  And is that your -- what you're talking

14  about, is that coming from -- just to be clear, is that coming

15  from the 608.016, or is it coming from the administrative code?

16            **MR. FOTY:**  Well, it's coming from both.  So 608.016

17  and then the administrative -- administrative regulations provide

18  further clarification about that, what that means.  And so,

19  the --

20            *(Whereupon, the reporter interrupts to preserve the*

21            *record.)*

22            **MR. FOTY:**  The administrative regulations further

23  expound on that, and they say -- and they explain what does an

24  employer have to pay for, what is compensable under Nevada law.

25            And Nevada administrative regulations, 608.115,

1   specifically states, An employer shall pay an employee for all

2   time worked by the employee at the direction of the employer --

3   and here's the key language -- including time worked by the

4   employee that is outside scheduled hours of -- including outside

5   the scheduled hours of work of the employee.

6              There is no corollary language like that under the

7   FLSA.  There is no corollary language like that under the

8   Portal-to-Portal Act.  In fact, the Portal-to-Portal Act is

9   directly contrary to that language --

10             **THE COURT:**  So your argument there is that if your

11  shift starts at 9:00 but you have to be there at 8:30 in

12  order -- or 8:45, whatever, five minutes early, even --

13             **MR. FOTY:**  Right.

14             **THE COURT:**  If you have to be there at 8:50 in order

15  to --

16             **MR. FOTY:**  Do some pre-shift work --

17             **THE COURT:**  -- get in on your shift, which is

18  obviously preliminary to your shift --

19             **MR. FOTY:**  Correct.

20             **THE COURT:**  -- and under the Supreme Court law and

21  the FLSA, preliminary work is not compensable, but you're saying

22  this provision says explicitly that preliminary work is work, and

23  it must be paid.

24             **MR. FOTY:**  That's correct.

25             **THE COURT:**  So that, in your view, is a direct

1   conflict?

2         **MR. FOTY:**  That is correct.

3         **THE COURT:**  And then tethers to this language from

4   *Terry*, which is, We part -- we rely on the FLSA when we decide

5   to, and we part ways with the FLSA when it's --

6         **MR. FOTY:**  When it's different.

7         **THE COURT:**  -- recorded by -- when we're different.

8         **MR. FOTY:**  Right.

9         **THE COURT:**  Okay.

10        **MR. FOTY:**  And, Your Honor, again, this is what the

11  Sixth Circuit -- when they carefully looked at the text of both

12  statutes, they said there's a -- you can't reconcile the two.

13  When it comes to what is compensable, they're different.  Under

14  Nevada law --

15        **THE COURT:**  Can I just ask you what the -- the Sixth

16  Circuit opinion is a Nevada case at the MDL, and I'm just curious

17  what you think about whether it's persuasive or binding in that

18  particular -- it's not binding as, like, law of the case because

19  it's not our case.  But I'm just curious about your perspective

20  on that.

21        **MR. FOTY:**  I think it's not a Ninth Circuit decision.

22  It's a circuit court decision from a different circuit.

23        I think it is persuasive, but I do think it's highly

24  persuasive because it's addressing the Nevada case that got

25  sucked into the MDL.  Okay?  That decision would have been made

 1  in Nevada had it not been taken to the MDL.

 2          **THE COURT:**  Uh-huh.

 3          **MR. FOTY:**  But, I think, given that it's a circuit

 4  court decision, I think that gives it heightened authority, but

 5  it is persuasive.

 6          And, Your Honor, just to further emphasize this

 7  point, when the Nevada legislative wants to adopt a provision of

 8  the FLSA, the Nevada legislature knows how to do that.  And the

 9  Nevada legislature has done that multiple times.

10          So, for instance, under Nevada law, there wasn't

11  originally an exemption, like the Motor Carrier Act exemption.

12  The Motor Carrier Act exemption was progeny of the FLSA because

13  when the motor carrier exemption was issued, there -- the idea

14  was you don't want there to be conflict between anybody who's

15  subject to the Department of Transportation's regulations and

16  someone who's also subject to the Department of Labor's

17  transportation (sic).  So the Motor Carrier Act exemption existed

18  to carve out those people who were subject to the Department of

19  Transportation's regulations.  Okay?

20          The Nevada legislature said, Okay.  We need a similar

21  exemption in our statute.  So then they went and they adopted it.

22  So the Nevada legislature knows how to do this.  They know how to

23  adopt specific provisions from the FLSA.  And the fact that there

24  simply is nothing in the FLSA that's even -- excuse me, nothing

25  in Nevada law that is even remotely close to the Portal-to-Portal

1  Act language, I think that's telling.

2        And, Your Honor, in light of the -- in line with the

3  *Terry* decision that Nevada law must be interpreted liberally in

4  favor of workers, I don't think it's a close call that Nevada law

5  has not adopted the Portal-to-Portal Act.

6        **THE COURT:** Can I -- I want to just ask you a little

7  bit about whether this is required by law.

8        I guess, my first question, just sort of thinking

9  about *In Re: Amazon,* is, does it make a difference at all under

10  your argument whether we're talking about a COVID screening or

11  anything else?

12        And then, two, to the -- maybe you should just

13  address briefly whether it does make a difference, either under

14  the definition of work or the -- to the extent compensable work

15  applies, whether it makes a difference there.

16        **MR. FOTY:** Okay. So in terms of whether this is

17  work, I think it's clear that the COVID -- pre-shift COVID

18  screening that workers have to pass before they can clock in to

19  see if they can work for the shift -- work for the day, I think

20  it's clearly that is work.

21        And so, to address, I guess -- I think you're -- is

22  there a distinction between a pre-shift COVID screening and a

23  post-shift antitheft screening?

24        I do think they are materially different. I think

25  they're highly different, because a pre-shift health screening

1  specifically ties into the work that the worker has to do for the

2  company.  Okay?

3            Let's say -- let's say, a worker has COVID and they

4  have long-haul COVID, and they can't breathe, and their health is

5  affected.  They're not going to be able to move packages around

6  an Amazon warehouse that's hundreds of yards and walk from one

7  point to the other and be as efficient as they would had they not

8  had COVID.

9            Likewise, if they have COVID and they infect the

10 warehouse, they cause a mass outbreak, that warehouse has to shut

11 down.  No one can do the work.

12           There's a specific tie-in between this health

13 screening and the work that the -- that the Amazon employees had

14 to do.  And that's why the Department of Labor has consistently

15 held in multiple regulations and multiple opinion letters that if

16 there's a physical examination or a health examination that's

17 required by the employer which is necessary for the employee to

18 do the job, that's compensable.  That's compensable work.

19           And, in fact, the Department of Labor issued an

20 opinion regarding temperature checks for COVID and stated, If

21 it's necessary for you to do your job, you got -- the employers

22 have to pay for it.  So this --

23           **THE COURT:**  So when you're saying that, you're saying

24 that's compensable under *Busk*?

25           **MR. FOTY:**  I think it's compensable under *Busk*.  I

1    think it's compensable either way.

2            **THE COURT:**  So that you're also saying *Busk*

3    may -- *Busk* is controlling on that particular search.  It

4    wouldn't necessarily --

5            **MR. FOTY:**  -- apply to here.  This is materially --

6            **THE COURT:**  Okay.

7            **MR. FOTY:**  Yeah.  This is -- this type of screening

8    is materially distinct from the *Busk* screening.  And, in fact,

9    since *Busk* was issued -- it was issued in 2014, almost ten years

10   ago -- circuit courts across the country have distinguished *Busk*,

11   so there's a case called *Aguilar v. MTC*, which is a -- involved

12   correctional officers.

13           And so these correctional officers who have to guard

14   prisons had to go through a pre-shift screening, you know, just

15   kind of like we do here when we go through the metal detector to

16   make sure there's no weapons when we walk into the courthouse.

17   Well, these correctional officers had to do the same thing.  And

18   in *Aguilar v. MTC*, the Court specifically held that that time

19   that correctional officers had to go through the security screens

20   in the morning, that's compensable under the FLSA because it's

21   directly tied to the work that those correctional officers had to

22   do, which is -- their job is to maintain security in the prison,

23   and they can't do their job if they inadvertently bring

24   contraband or weapons inside the prison.

25           And so, they distinguished *Busk* and said, Look, *Busk*

 1   has nothing -- that post-shift antitheft search that Amazon did
 2   had nothing to do with the ability of the workers to do their
 3   jobs.

 4           In this case, in this pre-shift health screening,
 5   this has everything to do with the ability of the workers to do
 6   their job.  If you eliminate that pre-shift health screening,
 7   Amazon was going to have mass outbreaks at each of those
 8   facilities, and those facilities were going to shut down, and
 9   those workers could not do their jobs.

10           But Amazon implemented those pre-shift health
11   screenings.  Amazon stayed open.  And as we know, Amazon's
12   profits skyrocketed during the pandemic because everybody was at
13   home, and they're ordering goods and services from Amazon online.
14   And Amazon needed to stay open.  Every single one of its
15   facilities needed to stay open so they could process those --
16   this mass increase in customer orders.

17           So, I think -- I think it's clear that it is work.
18   Amazon primarily benefitted from it.  There's a -- there's a case
19   that defense counsel did not raise, but it's called *Alvarez v.*
20   *IBP,* and it's a Ninth Circuit case which would be binding on this
21   court.

22           And in that case, the Court said that if the employer
23   is requiring an activity to comply with the law and that activity
24   is necessary for the employer to ensure legal compliance, that
25   primarily benefits the employer.

1           That's the same facts as this case, Your Honor.  I
2  mean, Amazon was required to do to ensure a safe workplace for
3  its workers if it was going to stay open, and these pre-shift
4  health screenings were necessary to ensure that Amazon complied
5  with the law.  I mean, I think if Amazon did not have these
6  pre-shift health screenings, the governor could have come in
7  there and shut down Amazon.  And so, it was necessary to ensure
8  that Amazon complied with the law and stayed open for business.
9           I'm happy to address all of the other arguments, as
10  well.  I think it's -- I think defense counsel's -- well, let me
11  back up.
12           One thing I want to -- I want to point out, so
13  defense counsel has repeatedly cited to this *Perez v. Walmart*
14  decision.  Okay?
15           I think that decision is a little bit -- I think the
16  citation of that decision is a little bit disingenuous, and
17  here's the reason why.  *Perez v. Walmart* was not an FLSA case.
18  The plaintiff did not bring a claim under the FLSA.
19           What the plaintiff brought in that case was a claim
20  under Missouri common law for unjust enrichment.
21           There is an FLSA case against Walmart for not paying
22  for pre-shift COVID screenings.  That case is called *Haro v.*
23  *Walmart*.  Defense counsel didn't cite to *Haro v. Walmart*.
24           And *Haro v. Walmart*, that case was recently
25  certified, and it's the -- I believe it's the largest collective

1  action in U.S. history --

2            **THE COURT:**  You mean class certified?

3        **MR. FOTY:**  Well, so in *Haro* -- I'm actually the

4  plaintiffs' lawyer in *Haro*.

5            **THE COURT:**  Uh-huh.

6        **MR. FOTY:**  In *Haro*, the plaintiffs brought a claim

7  under California law, under the California Labor Code, and a Fair

8  Labor Standards Act claim.  And the same defense lawyer who was

9  in *Perez v. Walmart* is the same defense lawyer who's in *Haro v.*

10 *Walmart*.  And that defense lawyer did not move to dismiss the

11 FLSA claim in *Haro*.

12           Now, he moved to dismiss the unjust enrichment claim

13 in *Perez*, but that's because it's even shaky whether you can

14 bring an unjust enrichment claim for pre-shift work.  Under the

15 FLSA, you can.

16           And two days ago, the Court in *Haro* certified across

17 the entire country a collective action for all Walmart hourly

18 paid workers who went through a pre-shift COVID screening.

19           So I think any citation to *Perez* is -- is simply not

20 relevant in light of the *Haro* decision, where you have a

21 pre-shift COVID screening case that's been certified as a

22 national collective action against Walmart for all approximately

23 2 million workers across the country.

24           **THE COURT:**  Can you just briefly maybe talk about the

25 workweek theory and maybe just -- yeah, in terms of overtime?

1            **MR. FOTY:**  So the workweek theory.  Well, I think
2    it's -- defense counsel made, I think, two separate arguments:
3    One, that minimum wage must be calculated on a workweek basis.

4            Again, that's one of those arguments that has already
5    been rejected.  So that argument was rejected by the Ninth
6    Circuit in the *Cordius* (phonetic) decision.

7            **THE COURT:**  Uh-huh.

8            **MR. FOTY:**  That argument was rejected by a sister
9    court in the District of Nevada in the case of *Nelson v. Walmart*.
10   And that very same argument was rejected by the Sixth Circuit in
11   *In Re: Amazon*.  So the argument that workers -- that minimum wage
12   must be calculated on a workweek basis as opposed to on a per
13   hour basis, that's been rejected by every court to have ever
14   considered it, and there's not one court that has supported that
15   argument.

16           Now, with respect to the overtime claim, the *Landers*
17   decision, *Landers* decision does hold that when an employee is
18   bringing an overtime claim, he has to specify facts to support
19   the overtime claim.  It does not say, though, that you have to
20   identify each specific week when you think that you had an
21   overtime claim.

22           Now, Your Honor, I think we have more than met the
23   *Landers* decision.  Here, we have provided Mr. Malloy's start date
24   and end date, his job position, his hourly rate, his work
25   schedule, and his normal hours of work and his normal hours per

 1    shift.  Now, we've identified that he was required to work

 2    overtime every week from the start of his employment to the end

 3    of his employment.

 4            So defense counsel is saying we didn't identify any

 5    week.  We've identified all the weeks.  And if you're already

 6    past 40 hours and you do a pre-shift screening off the clock, and

 7    even if it's five minutes, you add that five minutes, and you're

 8    already in an overtime claim because you're already past 40

 9    hours.  So we -- we've surpassed *Landers*.

10            Regarding the issue of whether or not there's a

11    viable cause of action for not paying all wages due at

12    termination, again, Your Honor, there's -- there's a court

13    decision that's already addressed that and rejected defense

14    counsel's argument.  That is the *Demoray* (phonetic) decision.

15            So, Your Honor, in summary, every argument that is

16    made by Amazon in this case to seek a dismissal has already been

17    rejected.  I think it's clear that this case needs to -- the

18    Court needs to deny Amazon's motion to dismiss and allow this

19    case to go into discovery, just like the *Boone* case, just like

20    the *Vincenzetti* case, just like the *Vaccaro* case.

21            **THE COURT:**  Thank you.

22            **MR. FOTY:**  Thank you.

23            **MR. PAEK:**  So, Your Honor, I'll address some of the

24    arguments made in opposition.

25            As to the *Vaccaro* and *Boone* reasoning, I think we

1  addressed that earlier.  I think those cases are not binding just

2  like *Pipich* and *Perez* are not binding.  But I think, as

3  articulated earlier in my motion argument, that really, the Court

4  should look at the analyses in all of those cases and see what is

5  the most complete analysis on the same issue.

6           And I think, when the Court does that, it will see

7  that *Perez* and *Pipich* go one step further.

8           To address opposing counsel's comment about *Perez v.*

9  *Walmart*, it is about unjust enrichment, but the underlying core

10  analysis in that case is still about compensability --

11           **THE COURT:**  Uh-huh.

12           **MR. PAEK:**  -- so because of that, the Court looked,

13  not only at the FLSA and analyzed that, but the *Steiner* case that

14  opposing counsel analyzes, and looked into the *Busk* standard, and

15  that's how it came about its decision.  That's why that decision

16  is instructive here.

17           As far as the *In Re: Amazon* ruling, I touched on that

18  earlier.  But really, the question before the Court is not what

19  the Sixth Circuit analyzed, but the question, as I talked about

20  at the very beginning of the hearing, is, what would the Nevada

21  Supreme Court do? because these are Nevada statutes.

22           So to determine what the Nevada Supreme Court does,

23  yet we can look at another court like looking through the lens of

24  *Terry*, but what we're arguing is, really, what we should do is

25  cut to the chase and go straight to those Nevada Supreme Court

1  cases, go straight to *Terry v. Sapphire* and go to *Csomos v.*
2  *Venetian*, which is an unpublished case, but it's closer to what
3  the Nevada Supreme Court would actually rule on because it's the
4  Nevada Supreme Court talking about the adoption of NRS 608.018
5  and how that's related to federal overtime.

6          *Terry* establishes how minimum wage is based on
7  federal minimum wage.  And then both of the -- and then, both of
8  those cases contrast with the other two cases -- *Dancer v. Golden*
9  *Coin,* where there is a conflict, and *Thomas v. Yellow Cab*, where
10 there's a conflict.

11         So I think those are the guideposts of the Nevada
12 Supreme Court.  We've got four cases there that lay out what the
13 Court should look at to this core question of what's really
14 conflicting and what's really materially different.

15         So going back to what opposing counsel touched on and
16 what this Court asked about earlier, the 608.016 language about
17 each hour of work doesn't get to that underlying definition that
18 we're arguing about here, which is the definition of work and
19 what is compensable work.  And plaintiff's counsel concedes that
20 since Nevada doesn't have it, we have to look at the FLSA.

21         So if we're going to look to the FLSA for work, what
22 we're saying is, well, you can't do that and parse out the
23 Portal-to-Portal Act because that's -- that's an -- would we even
24 be talking about this if the Portal-to-Portal Act was called the
25 amended FLSA?  I mean, it's a part of it, and the body of case

1   law, the test that we're arguing over here, the integral and

2   dispensable test, the primarily-for-the-benefit test all arose

3   from the -- all arose from those statutes.

4            So we can't just pick and choose and say, I'm just

5   going to look at FLSA and *Steiner* from 1956 and ignore everything

6   else.  That's -- that's -- and the -- the most recent and most

7   re-critical look at this was *Busk v. Integrity*, which Your Honor

8   knows arose out of this district out of Judge Hunt's court, went

9   up to the Ninth Circuit, he was reversed and then was completely

10  reversed by the U.S. Supreme Court on a relatively 9(o) decision

11  that we don't get too much nowadays.  And that Court, even with

12  the concurring opinions of Justices Kagan and Sotomayor both

13  compared and contrasted the *Steiner* case and the cases that

14  plaintiff cites and still found the better test is to look at the

15  principal activity and let's go from there.

16           And that's the core what we're asking the Court to

17  do.  We're asking the Court to look at those cases and do that

18  same analysis and see where we would wind up, instead of just

19  doing it in broad strokes.

20           I think those were the main points I had to cover,

21  but I'll be happy to answer any further questions that the Court

22  may have.  I know we --

23           **THE COURT:**  No --

24           **MR. PAEK:**  -- went well above our 20-minute

25  allocation, but --

 1          **THE COURT:**  I think I -- I think I'm good.  So I

 2   think -- I just really appreciate the argument from both of you.

 3          I'm just going to just take a moment to gather my

 4   thoughts.  So just hang on -- you can be seated and just hold on

 5   for a moment while I gather my thoughts, and I might just check

 6   in with my law clerk.

 7          **MR. PAEK:**  Thank you, Your Honor.

 8          **THE COURT:**  Thank you.

 9      *(Court and law clerk conferring.)*

10          **THE COURT:**  Okay.  I think I'm just going to rule

11   orally in this case because we are at the motion to dismiss

12   stage.  So I understand that there are two motions to dismiss.

13   Actually, one of them is sort of related to the original

14   complaint, and the plaintiffs has an amended, so there's a second

15   motion to dismiss.  So those are ECF 17 and 22.

16          Obviously, as we've been talking about, the

17   plaintiffs are claiming that what's at issue here is payment for

18   what they call work during the COVID-19 screening procedures

19   before each shift during the pandemic, and there's four claims

20   that all tether to that definition of work.  One is payment for

21   work done under 608.016.  That's Claim 1.

22          Claim 2 is Nevada wage amendment claim under Nevada

23   constitution.

24          Three is -- pertains to overtime for -- based on the

25   claim that they were legally entitled to overtime -- or could

1  have been entitled to overtime for that time spent during the

2  screening procedures that might have exceeded their normal hours.

3          And then, Claim 4 is about payment upon termination

4  of service.

5          As you know, I'm looking at these -- Amazon moved to

6  dismiss all of these claims for failure to state a claim under

7  12(b)(6).  That is a -- you know, it's a rigorous standard, but

8  is still -- the test is whether there are sufficient facts to

9  state a claim that is plausible on its face.  And at this stage,

10  I have to accept in that analysis plaintiffs' allegations as true

11  and can only dismiss if the claims are not plausible.

12          As we've been talking about here this morning, all of

13  the arguments here turn on the definition of work under Nevada

14  law.  And I do find -- I'm going to deny both of the motions to

15  dismiss because I do find that what we're talking about here is

16  either work as a matter of law, or at least there's -- certainly,

17  at this stage, there's a plausible claim that it is -- does

18  qualify as work under Nevada law.

19          As we've been discussing, Nevada does not define the

20  term -- uses the term "work" in its own statutes but does not

21  define that term and has historically looked to the FLSA for the

22  definition of work.

23          And there is an argument made that the -- what we

24  really should be looking at is whether this screening time is

25  compensable work.  But that depends on -- that rests on the

1    premise that Nevada has incorporated the Portal-to-Portal Act.

2    And I find that it has not done so; that it has not incorporated

3    the Portal-to-Portal Act.

4           I'm really relying here on the reasoning, which I

5    found very persuasive and carefully done, in the *In Re: Amazon*

6    case out of the Sixth Circuit, as we've talked about.  That was

7    an MDL case, but it was out of Nevada.  And it specifically

8    looked in the post-*Busk* phase at claims that were only alleged

9    under Nevada law, just as they are here, because we also do not

10   have any FLSA claims.

11          And the Court -- I do note also that Nevada Supreme

12   Court has cited *In Re: Amazon* with approval and did so in Doe

13   *Dancer 1 v. La Fuente Incorporated*, 481 P.3d 860, 867, Nevada

14   2021.  That decision, *Doe Dancer*, explicitly says that it's sort

15   of a next step after *Terry*.  And it was -- its analysis did not

16   rely on the same issue that we have here, but it definitely cited

17   *In Re: Amazon* with approval, which I find makes the *In Re: Amazon*

18   case even more persuasive that it has been considered by the

19   Nevada Supreme Court and cited with approval.

20          So in the Sixth Circuit case, in *In Re: Amazon*, the

21   Court acknowledged that the Nevada Supreme Court has signaled its

22   willingness to part ways with the FLSA where the language of

23   Nevada statutes has so required.  That was the Sixth Circuit

24   citing to the *Terry* case from the Nevada Supreme Court.  *Terry* is

25   *Terry v. Sapphire Gentleman's Club* at 336 P.3d 951.  That's from

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023      55

1   2014.  And in *In Re: Amazon*, the Court acknowledged that unlike

2   the FLSA, which draws the distinction between what is work and

3   what is compensable work, Nevada law requires that an employer

4   pay an employee for all work.  And that's reflected in

5   NRS 608.016 and specifically in the administrative code that

6   supports that, which refers to the -- to all time worked,

7   specifically, using that language, and acknowledges that all time

8   worked covers work that is outside the scheduled hours of the

9   work of the employee.

10           I do read that explicit language both in the statute

11   and in the regulation as in conflict with the FLSA provisions on

12   what is compensable work.  So I think that Nevada has parted

13   ways, as the Sixth Circuit acknowledged, with the FLSA on this

14   specific point and is broader and thus requires that an employer

15   pay an employee for work, period.

16           So with that, I just acknowledge that we are not, in

17   this case, in my estimation, dealing with a compensable work

18   issue.  We're dealing with an issue of whether this is work.

19           I don't think any party is suggesting that the

20   definition of work is -- well, it's definitely controlled by the

21   FLSA.  It's reaffirmed by *Busk* and other decisions, including

22   *Alvarez* in the Ninth Circuit, but obviously *Busk* from the Supreme

23   Court, that this requires -- that work is activity that is

24   controlled or required by the employer and pursued necessarily

25   and primarily for the benefit of the employer and his business.

1          I don't think there's any dispute here that this

2   activity of the screening was controlled by Amazon.  And I do

3   think that while there is a dispute about whether the

4   Amazon -- the screenings were primarily for Amazon, there is a

5   clear indication that they were; that they allowed -- that they

6   were required by law, which is significant, under the *Alvarez*

7   decision, that particularly not only *Alvarez* from the Ninth

8   Circuit, but *Alvarez* went to the Supreme Court.  And there's a

9   distinction about work versus compensable work in that scenario,

10  and I think that -- that the required safety checks in *Alvarez* in

11  the meat processing plant are similar to the prescreening --

12  COVID prescreening procedures here.

13         They're happening at the beginning of the shift.

14  They are primarily to make sure that the warehouse is safe so

15  that the warehouse can stay open.  And even though Amazon might

16  not have been required by law to institute -- to implement this

17  particular COVID screening precaution, they were required to

18  implement some precaution, and they chose to do this.  So in that

19  respect, it was required by law, and it's also distinct from the

20  sort of anti- -- post-shift antitheft screenings that were at

21  issue in *Busk*.

22         So based on that, I do find that this was work.  I

23  also find that I don't need to address the integral and

24  indispensable aspect of the test because that is terminology used

25  in the compensable work framework.  I don't think that that

1   applies, based on the statutes and the careful analysis of the

2   Sixth Circuit in *In Re: Amazon*.

3            I do find that the plaintiffs have plausibly alleged

4   that they -- that during the COVID screening procedures at each

5   shift at the Amazon warehouses that that was work for which they,

6   under Claim 1, should have been paid but were not paid in

7   violation of 608.016; that they were entitled to but did not

8   receive payment under Nevada's Minimum Wage Amendment, which is

9   Nevada Constitution Article 15 Section 16; that the work

10  was -- that they were legally entitled but did not receive

11  overtime compensation in violation of 60 -- NRS 608.018; and

12  the -- that their wages earning and owing upon termination were

13  not paid.  That's at least what they allege, and based on those

14  allegations, I find that that's plausible, and that was in

15  violation of the -- the statutes 608 -- NRS 608.020 to .050.

16           So with that, I appreciate that there are many

17  factual issues that might sort of distinguish -- sort of fine

18  tune the application of laws.  I'm really just looking at the

19  allegations in the complaint and whether they plausibly state a

20  claim that survives dismissal, and I find that they do.

21           So with that, I'm going to deny -- I guess I'm going

22  to deny the motion to dismiss in ECF 22 and view -- find that the

23  motion to dismiss based on ECF 17 is moot.

24           So that's my ruling.  And I thank you again very much

25  for your thoughtful -- your very high quality briefing and your

2:22-cv-00286-ART-VCF - Thursday, March 2, 2023    58

1    thoughtful arguments.  Thank you.

2               **MR. FOTY:**  Thank you, Your Honor.

3               **MR. PAEK:**  Thank you, Your Honor.

4               **COURTROOM ADMINISTRATOR:**  Please rise.

5                    (*Proceedings adjourned at 12:24 p.m.*)

6                         --o0o--

7                 COURT REPORTER'S CERTIFICATE

8         I, Paige M. Christian, Official Court Reporter, United

9    States District Court, District of Nevada, Las Vegas, Nevada, do

10   certify that pursuant to 28 U.S.C. § 753, the foregoing is a

11   true, complete, and correct transcript of the proceedings had in

12   connection with the above-entitled matter.

13

14   DATED:  March 8, 2023

15

16                       /s/ Paige M. Christian_____
                         Paige M. Christian, RPR, CRR, CCR #955
17                       Official Court Reporter
                         United States District Court
18                       District of Nevada

19

20

21

22

23

24

25